UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JENNIFER DAVID, TANYA DAVID      CIVIL ACTION NO. 6:11-cv-01945
MENSMAN, and J. SHANE DAVID

VERSUS                  MAGISTRATE JUDGE HANNA

LAFAYETTE SPECIALTY HOSPITAL,     BY CONSENT OF THE PARTIES
L.L.C. d/b/a TRIUMPH MEADOWBROOK
SPECIALTY HOSPITAL LAFAYETTE

## MEMORANDUM  RULING

Currently pending before this Court is the defendant's motion for summary judgment.  (Rec. Doc. 43).  For the reasons set forth below, the motion is denied.

### BACKGROUND  FACTS

From January 24, 2011 through February 11, 2011, Ludovic David was hospitalized at Meadowbrook Hospital, a long-term acute care facility, owned and operated by the defendant, Kindred Hospital Lafayette, which was incorrectly referred to in the plaintiff's complaint as Lafayette Specialty Hospital, L.L.C. d/b/a  Triumph Meadowbrook Specialty Hospital Lafayette.  For the sake of clarity, the hospital will be referred to in this ruling simply as Meadowbrook.  On February 11, 2011, Mr. David was transported from Meadowbrook to the emergency room at Lafayette

General Hospital, where he was diagnosed with severe dehydration and other conditions. He was subsequently released from Lafayette General and admitted to a different long-term care facility, where he died on March 23, 2011. At the time of his death, Mr. David was approximately 84 years old.

In their complaint, Mr. David's surviving children, Jennifer David, Tanya David Mensman, and J. Shane David, allege that Meadowbrook provided negligent, substandard care to their father, which hastened his death. They seek to recover damages for Mr. David's allegedly wrongful death and alleged lost chance of survival, as well as for pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life.

## ANALYSIS

In the instant motion, Meadowbrook seeks dismissal of the lawsuit, arguing that it is entitled to summary judgment in its favor because the plaintiffs cannot prove the necessary elements of their medical malpractice claim against the hospital.

## A.    THE SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the

moving party is entitled to judgment as a matter of law.  A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[1]  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[2]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[3]  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[4]  All facts and inferences are construed in the light most favorable to the nonmoving party.[5]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that

---

[1]      *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[2]      *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252; *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[3]      *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[4]      *Id*.

[5]      *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

there is insufficient proof concerning an essential element of the nonmoving party's claim.[6]   The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[7]

**B.    MEADOWBROOK IS NOT ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR**

This is a medical malpractice lawsuit, in which subject-matter jurisdiction is premised upon diversity.  "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."[8]  To determine the applicable Louisiana law, federal courts look to the final decisions of the Louisiana Supreme Court.[9]

Under Louisiana law, a plaintiff asserting a medical malpractice claim must establish, by a preponderance of the evidence, the applicable standard of care, a

---

[6]    *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008), citing *Celotex Corp. v. Catrett*, 477 U.S. at 325.

[7]    *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

[8]    *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427(1996).  See, also, *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269 (5th Cir. 2009).

[9]    *Moore v. State Farm*, 556 F.3d at 269; *In re Katrina Canal Breaches Lit.*, 495 F.3d 191, 206 (5th Cir. 2007).

breach of that standard of care, and a causal connection between the breach of care and the patient's injury.[10]

The doctors who cared for Mr. David while he was at Meadowbrook are not employed by that hospital; instead, they are independent contractors provided to the hospital by a company that employs physicians.[11]   The nurses who work at Meadowbrook, however, are the hospital's employees, and Meadowbrook is vicariously liable for their negligence, if any.   In Louisiana, nurses who perform medical services are subject to the same standards of care and liability as are physicians.[12]

The nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his or her best judgment, in the application of his or her skill to the case.[13]   In other words, "[i]n order to recover for the negligence of a nurse, a plaintiff must prove by [a] preponderance of the

---

[10]     *Pfiffner v. Correa*, 94–0924, 34–0963, 94–0992 (La .10/17/94), 643 So.2d 1228, 1233.

[11]     Rec. Doc. 46-11 at 6-7; Rec. Doc. 46-12 at 9.

[12]     *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654, 661 (La. 1989).

[13]     *Little v. Pou*, 42,872 (La. App. 2 Cir. 01/30/08), 975 So.2d 666, *writ denied*, 08–0806 (La. 06/06/08), 983 So.2d 920, citing *Cangelosi v. OLOL*, 565 So.2d at 661.

evidence:  (1) the degree of care ordinarily exercised by nurses; (2) that the nurse failed to use reasonable care and diligence, along with her best judgment in the application of that skill; and (3) that as a proximate result of this failure, the plaintiff suffered injuries that would not otherwise have been incurred."[14]  Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.[15]

In this case, it is undisputed that the nurses working at Meadowbrook were trained to detect the signs of dehydration in their patients.  It is equally undisputed that the standard of care applicable to Meadowbrook's nurses required them to notify a doctor when there were changes in a patient's condition.  For example, Dr. Jody Rosson, Jr., Mr. David's treating physician, testified as follows at his deposition:

> Q.    When you make your rounds, would it be fair that typically you go from room to room, patient to patient, and you rely on the nurse to give you an update on what's been going on with the patient?

> A.    Most definitely.

---

[14]    *Vance v. Oceaneering Intern., Inc.*, No. 11-745, 2012 WL 1755740, at *3 (E.D. La. May 16, 2012).

[15]    *Pfiffner v. Correa*, 643 So.2d at 1234; *Samaha v. Rau*, 2007-1726 (La. 02/26/08), 977 So.2d 880, 884; *Schultz v. Guoth*, 10–0343 (La. 01/19/11), 57 So.3d 1002, 1007.

Q.    That is the standard of care for the nurse to know what's going on
with the patient and keep the physician informed?

A.    Yes.

Q.    And I think you alluded to earlier the fact that there might be
some symptoms that may not be overtly present at the time that
she noticed in the days or hours before and she brings those to
your attention; is that correct?

A.    Yes.

Q.    That's the standard of care for a nurse?

A.    Yes.[16]

Stephanie Rossyion, Meadowbrook's chief clinical officer, and Meadowbrook nurse
Annagail Price confirmed that the standard of care applicable to nurses includes a
duty to inform the doctor of a change in the patient's condition.  (Rec. Doc. 46-9 at
29; Rec. Doc. 46-10 at 12).  More particularly, Nurse Price testified that she was
trained to recognize the signs of dehydration and to report them to the doctor.  (Rec.
Doc. 46-10 at 15).   Dr. Felicia Ward, a physician who treated Mr. David at
Meadowbrook, testified that it is the nurse's responsibility to advise the physician of
a change in the patient's mental or physical condition. (Rec. Doc. 46-11 at 11-12).
Meadowbrook's expert, Dr. Charles Simonson, also testified that Meadowbrook's
nurses had a duty to check for signs of dehydration.  (Rec. Doc. 46-5 at 12).

---

[16]    Rec. Doc. 46-4 at 75-76.

Nurse Price testified that Meadowbrook's nurses were also obligated to report missed meals and lack of adequate fluid intake to a physician. (Rec. Doc. 46-10 at 16). She also testified that diarrhea was to be reported to the doctor. (Rec. Doc. 46-10 at 17). Mr. David's daughter Jennifer testified that her father had diarrhea at Meadowbrook that was not noted in his chart. (Rec. Doc. 46-13 at 61-62). Nurse Price was unaware of Mr. David having had diarrhea. (Rec. Doc. 46-10 at 47). Nurse Price also testified that Meadowbrook's nurses were required to keep track of their patients' measured input and output (Rec. Doc. 46-10 at 32-33), but she discussed Mr. David's output in terms of his soiled diapers rather than measured amounts (Rec. Doc. 46-10 at 25-26).

On February 10, 2011, Mr. David had increased respirations that were not reported to a physician. (Rec. Doc. 46-10 at 24). Nurse Price testified that the increased respirations continued on the morning of February 11, 2011, and she did then notify Dr. Ward. (Rec. Doc. 46-11 at 34). Dr. Ward gave orders for diagnostic testing, which were carried out. (Rec. Doc. 46-11 at 34-35). But Meadowbrook's nurses did not advise Dr. Ward that Mr. David did not improve. (Rec. Doc. 46-10 at 35). When Dr. Ward arrived at Meadowbrook on the afternoon of February 11, 2011, she found Mr. David unresponsive, which was an acute change in his condition. (Rec. Doc. 46-11 at 37). She suspected that he was dehydrated (Rec. Doc. 46-11 at

38, 54), and she noted that there was an acute change in the level of his alertness (Rec. Doc. 46-11 at 37, 41).  She ordered that he be transported to Lafayette General's emergency room for acute care.  (Rec. Doc. 46-11 at 37, 41).

There is, at minimum, a genuine question as to whether Meadowbrook's nurses deviated from the applicable standard of care by failing to properly record Mr. David's input and output, failing to detect that he was severely dehydrated, failing to report his respiratory distress to a doctor on February 10, 2011, and failing to report that his respiratory distress did not improve on February 10-11, 2011.

Upon arrival at Lafayette General, Mr. David was examined by Dr. Michael Peebles.  Dr. Peebles found that Mr. David had sunken eyes and dry mucus membranes.  (Rec. Doc. 46-1 at 23).  He ordered blood work, which was abnormal. (Rec. Doc. 46-1 at 27-28).  His impressions or diagnoses, based on the physical examination and test results, were that Mr. David was suffering from respiratory failure, acute renal failure secondary to dehydration, and sepsis.  (Rec. Doc. 46-1 at 35, 45-47, 71).  Although Dr. Peebles did not conclude that the dehydration caused Mr. David's respiratory failure (Rec. Doc. 46-1 at 57, 58), he explained that dehydration affects a patient's mental status, causing weakness, confusion, and a lack of energy, as well as an elevated heart rate (Rec. Doc. 46-1 at 78).  Dr. Peebles found that Mr. David was "very dehydrated' (Rec. Doc. 46-1 at 85) or "severely

-9-

dehydrated," (Rec. Doc. 46-1 at 90), and stated that it was more likely than not that the dehydration had been "going on for a period of time" more than several hours long (Rec. Doc. 46-1 at 89). Dr. Peebles opined that Mr. David's acute renal failure was caused by dehydration. (Rec. Doc. 46-1 at 94). After being evaluated in the emergency room, Mr. David was admitted to the hospital's ICU. (Rec. Doc. 46-1 at 36).

Dr. Jody Rosson, Jr., Mr. David's treating physician (Rec. Doc. 46-4 at 36, 76), concurred that Mr. David's dehydration was clinically severe upon his admission to Lafayette General. (Rec. Doc. 46-4 at 71). He also confirmed that the test results obtained by the emergency room physician were consistent with dehydration. (Rec. Doc. 46-4 at 38, 39). Like Dr. Peebles, he opined that it is unlikely that Mr. David became so severely dehydrated in less than twenty-four hours. (Rec. Doc. 46-4 at 74). He stated that IV fluids are a treatment for dehydration (Rec. Doc. 46-4 at 49-50), and that, while Mr. David was hospitalized at Lafayette General, he required IV fluids to combat dehydration. (Rec. Doc. 46-4 at 69-70).

Although he did not conclude that Meadowbrook's nurses failed to satisfy the applicable standard of care, Meadowbrook's expert concluded that Mr. David's "dehydration should have been recognized earlier." (Rec. Doc. 43-4 at 5). He also

opined that Mr. David's respiratory failure could have been caused by dehydration. (Rec. Doc. 46-5 at 7).

An EEG taken while Mr. David was hospitalized at Lafayette General on February 17, 2011, showed that he had global brain dysfunction.  (Rec. Doc. 46-6 at 8).

Mr. David died approximately six weeks later due to septic shock that resulted from either of two sources or a combination of the two, namely, clostridium difficile colitis or pseudomonas pneumonia versus tracheobronchitis.  (Rec. Doc. 46-4 at 76). Dr. Rosson is of the opinion that these infections resulted in septic shock that was compounded by an anoxic brain injury and severe dehydration.  (Rec. Doc. 46-4 at 76-80).  Meadowbrook's expert, Dr. Simonson, testified that the immediate cause of death was dehydration as well as the infections listed on the death certificate.  (Rec. Doc. 46-5 at 6).  Mr. David's treating neurologist, Dr. David Weir, testified that severe dehydration can lead to anoxic brain injury.  (Rec. Doc. 46-6 at  14, 15).

Neither Dr. Ward nor Dr. King were asked, at their depositions, what they would have done had they been advised earlier that Mr. David was likely dehydrated. However, as noted above, the plaintiffs, as the nonmoving parties, are entitled to have all facts and inferences construed in the light most favorable to them.  Based on the deposition testimony of the medical professionals other than Dr. Ward and Dr. King,

it would be reasonable for the jury to draw the inference that, if Dr. Ward or Dr. King had been notified that Mr. David exhibited symptoms of dehydration, these doctors would have rehydrated him through the use of IV fluids.  It would also be reasonable for the jury to draw the inference that, had this been done, Mr. David's emergency hospitalization at Lafayette General could have been avoided along with the complications that resulted from his severe dehydration possibly including the anoxic brain injury and the C-diff and pneumonia infections that he contracted between the time that he was transported to Lafayette General and the date of his death.

The undersigned therefore finds that Meadowbrook has not proven that the plaintiffs will be unable to establish the three elements of their medical malpractice claim at trial.  Meadowbrook's nurses had a duty to look for signs of dehydration in their patients and to report changes in their patients' conditions to a doctor.  There is, at minimum, a genuinely disputed issue as to whether Meadowbrook's nurses deviated from that standard, and it would be reasonable to infer that, had they complied with the standard, Mr. David's severe dehydration, hospitalization, respiratory distress, anoxic brain injury, and fatal infections could have been avoided or minimized.  Accordingly, Meadowbrook is not entitled to summary judgment in its favor, and its motion will be denied.

<u>CONCLUSION</u>

Defendant Meadowbrook has not proven that the plaintiffs will be unable to prove the necessary elements of their medical malpractice claim at trial. Consequently, Meadowbrook is not entitled to summary judgment in its favor. Meadowbrook's motion for summary judgment (Rec. Doc. 43) is DENIED.

Signed at Lafayette, Louisiana on April 2nd, 2013.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE